# Exhibit F

DocuSign Envelope ID: D4410B56-348E-48CD-8486-43AB2E053155

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY CABE, SEAN FREY, ANITA POTEETE, RONDA ROHDE, ROBERT SNELL, JEFFREY MOORE and ELISA TINNELL, MICHAEL KAP, KAREN ROBERTSON, JIM WESTRA, JOHNNY RUIZ, ARCHIE ROBINSON, DECODA KEYS and NORMA MOODY, Each Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> **EVERGREEN PACKAGING LLC and PACTIV EVERGREEN INC.,** <br><br> Defendants. | Case No.  1:24-CV-01316 <br><br> Hon. John Robert Blakey <br><br> Hon. Jeffrey T. Gilbert |

**DECLARATION OF DERRICK DYAS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

I, Derrick Dyas, hereby declare as follows:

1. I am over 18 years of age and competent to testify as to the matters in this Declaration. I have personal knowledge of the facts set forth in this declaration, or I have knowledge of such facts based on my review of the business records and files of Evergreen Packaging LLC (the "Company" or "Evergreen"). If called as a witness, I could and would testify competently to such facts contained herein.

2. I was the Human Resources Director who oversaw the Canton Mill. In June of 2023, the Canton, North Carolina Mill began the process of ceasing the paper operations. At that time, there were just shy of 1000 production workers employed at the Mill. By October of 2023, approximately 60 employees remained to assist with clean up. Currently, approximately 8 to 10

1

employees remain – they strictly operate the Waste Water Treatment Plant. The paper operation has officially shut down.

3. The Canton facility is a union facility. Specific to the paper operation, it operated 24 hours a day, 7-days a week and operated on two twelve-hour shifts.

4. The Canton Mill utilized a 30-minute grace-period at both the start and end of shifts that incorporated a "shift-relief buddy system", where Mill employees were designated to a "buddy" who relieved them at the end of their shift. Once the relief (or the buddy) arrived, the employee assigned to the earlier shift stopped working and clocked out, and the buddy clocked in and began taking over the operations of the job. This timekeeping was necessary due to the needs of the business and ensured that the Canton production line remained fully operational and always controlled by an employee.

5. As a result of the differences between each department, the Mill had fostered a unique culture that incentivized employees to work collaboratively together and communicate coverage for every shift. Employees communicated with each other as to when they are working, how long they are working, and how their buddy was going to cover their shift so that an employee was on the job for every minute of every day. The same information went to the managers, as employees and managers shared similar continuous communication regarding when employees were working. This helped ensure that employees were paid correctly and for all time worked.

6. I am unaware of any employees performing work off-the-clock and no employee complained to me about working off-the-clock at any point during my tenure with the Company or my time at the Mill. Managers at the Canton Mill were directed to ensure that employees were not working off-the-clock.

7. I recall that Mr. Jeffrey Cabe, alongside several family members, worked at the Canton Mill before it shut down. As part of the shutdown, Mr. Cabe was offered a severance and release agreement where he released all claims related to his employment with Evergreen and at the Canton Mill. A true and correct copy of Mr. Cabe's Release is attached as **Exhibit A**. There is no record of Mr. Cabe ever making a complaint of not getting paid for all of his work or of having to perform off-the-clock work. Mr. Cabe voluntarily executed the Release.

8. If there was ever any issue with a missed punch or time adjustment, an employee had the opportunity to notify a supervisor, who would have adjusted the time accordingly. The employee's time would have then been changed to reflect the hours they worked. The employees always had the option to alert the union of any pay or time issues. The union would have then addressed it directly with the Company. To my knowledge, no union representative ever addressed with the Company any issue concerning an employee working off the clock.

9. I have reviewed relevant records and Plaintiff Jeffrey Cabe was employed by Blue Ridge Paper Products LLC.

10. I have reviewed relevant records and Plaintiff Sean Frey was employed by Pactiv LLC.

11. I have reviewed relevant records and Plaintiff Anita Poteete was employed by Pactiv LLC.

12. I have reviewed relevant records and Plaintiff Ronda Rohde was employed by Pactiv LLC.

13. I have reviewed relevant records and Plaintiff Robert Snell was employed by Pactiv LLC.

14. I have reviewed relevant records and Plaintiff Jeffrey Moore was employed by Pactiv Packaging LLC.

15. I have reviewed relevant records and Plaintiff Elisa Tinnell was employed by Pactiv LLC.

16. I have reviewed relevant records and Plaintiff Michael Kapolka was employed by Fabri-Kal LLC.

17. I have reviewed relevant records and Plaintiff Karen Robertson was employed by Pactiv Packaging Inc.

18. I have reviewed relevant records and Plaintiff Jim Westra was employed by Evergreen Packaging LLC. Plaintiff Westra was terminated in July of 2016.

19. I have reviewed relevant records and Plaintiff Johnny Ruiz was employed by Pactiv LLC.

20. I have reviewed relevant records and Plaintiff Archie Robinson was employed by Pactiv LLC.

21. I have reviewed relevant records and Plaintiff Decoda Keys was employed by Pactiv Packaging Inc.

22. I have reviewed relevant records and Plaintiff Norma Moody was employed by Pactiv LLC.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and that I would so testify if called upon to do so in this matter.

Executed this 1st day of July 2024 in _Tampa___, Florida.

*Derrick Dyas*
_____
Derrick Dyas

4

# Exhibit A

## SEPARATION AGREEMENT AND RELEASE

**THIS SEPARATION AGREEMENT AND RELEASE** ("Release") is made and entered into between **Jeffery Cabe** ("I," "me," or "my") and Blue Ridge Paper Company d/b/a Evergreen Packaging LLC, including its predecessors, successors, parents, subsidiaries and affiliates ("Company").

### AGREEMENT

I understand that it is the Company's practice to require employees who receive separation benefits to sign a release of claims. In exchange for my receipt of the consideration listed below, I have agreed to the provisions of this Agreement and to release the Company from any claims as described herein through the date of this Release.

Therefore, in consideration of the mutual promises made below, the Company and I agree as follows:

1. **Consideration.** In consideration of and subject to the provisions of this Agreement, I will receive the following:

    (a) A lump sum severance payment of **$1166.00**, less withholdings and deductions ("the Severance Payment").

    (b) If I am covered under Employer's healthcare plan on the Separation Date, I may continue those benefits in accordance with COBRA at the active employee contribution rates, on an after-tax basis, for one month and I will be billed directly for payment of the employee contribution.

    (c) An additional lump sum payment of **$3153.12**, less withholdings and deductions ("the Retro Pay Lump Sum")

The Severance Payment and Lump Sum will be paid to me in a single lump sum as soon as administratively feasible after I have returned to the Company a signed copy of this Release and the Revocation Period described below has expired. I understand and agree that I will not receive the Severance Payment, or any other consideration contained in this Agreement, unless I execute this Agreement, do not revoke this Agreement, and fulfill the promises contained in this Agreement.

2. **Release.** In exchange for the consideration outlined above, I agree to release the Company from all claims, demands, actions or liabilities I may have or may claim to have, known or unknown, against the Company of whatever kind, including but not limited to, those which are related to my employment with the Company or the termination of my employment, up to and including the effective date of this Release. I agree that this also releases from liability the Company's parent, subsidiary and affiliated corporations, their predecessors, successors, and assigns (specifically including but not limited to Pactiv Evergreen Inc.), and the Company's officers, directors, and employees, whether in their official or individual capacities. I agree that I have executed this Release on my own behalf, and also on behalf of any heirs, agents, representatives, successors and assigns that I may have now or in the future.

    a. **Released Claims.** I agree that this Release covers claims under the Civil False Claims Act (including any entitlement to share in any recovery by the United States) as well as any federal, state or local statute, regulations or common law doctrine regarding or relating to employment discrimination, terms and conditions of employment, or termination of employment including but not limited to, the following: Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1874, Sections 1981 through 1988 of Title 42 of the United States Code, as amended, the Age Discrimination in Employment Act (ADEA), the Equal Pay Act, the Older Workers Benefit Protection Act (OWBPA), the Rehabilitation Act of 1973, the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), the Employee Retirement Income Security Act (ERISA), the National Labor Relations Act (NLRA), the Occupational Safety and Health Act (OSHA), the Genetic Information Nondiscrimination Act of 2008 (GINA) and all applicable amendments and regulations, state human rights or fair employment practices laws; breach of contract, whistleblower, promissory estoppel, defamation, employment negligence, or any other contract, tort or other legal theory. All claims that are covered by this Release are referred to as "Released Claims."

b. **Claims not Released**. My release does not waive my right to file an administrative charge with or participate in an administrative proceeding conducted by any governmental agency, although to the extent permitted by law, my release does waive my right to receive any individual remedy, including monetary damages, in connection with any administrative charge concerning my employment. This release also does not waive any claim that arises after I sign this Agreement, and it does not apply to any claims that cannot be released as a matter of law.

3. **Non-Admission**. By entering into this Release, the Company does not admit that it has acted wrongfully with respect to my employment or the termination of my employment or that I have any rights or claims against the Company.

4. **Acknowledgements and Affirmations**.

a. I agree and promise not to sue the Company based on a Released Claim, except that I may bring a claim under the ADEA to challenge this Release. In addition, in the event I sue the Company (other than under the ADEA), I may be required, at the Company's option, to return all monies and other benefits paid to me pursuant to this Release.

b. I affirm that I did not incur a workplace injury or occupational disease that I have not reported to the Company.

c. I acknowledge that I have been given adequate opportunity to advise my supervisor, manager, a human resources representative, a compliance officer, and have so advised such representative, of all facts that I am aware of that constitute or might constitute a violation of any ethical, legal or contractual standards or obligations of the Company. If I learn of such facts in the future, I agree to report such facts to the Company.

d. I affirm that I have returned all the Company's property.

e. [FOR EMPLOYEES WHO ARE NOT MEDICARE ELIGIBLE] I affirm that as of the date I sign this Agreement, I am not Medicare eligible.

e. [FOR EMPLOYEES WHO ARE MEDICARE ELIGIBLE] I affirm that as of the date I sign this Agreement, I am not aware of any claim for injury, illness, or medical expenses which Medicare has paid, and to the best of my knowledge, there are no Medicare liens against me. In the event I have a Medicare claim or a Medicare lien, and Medicare seeks to hold the Company liable, I understand that the Company may seek the return of some or all monies and other benefits paid to me pursuant to this Release. In the event that the Company seeks the return of monies or benefits, I retain all rights and defenses in connection with such claim, including with respect to the Company's right to seek such reimbursement.

f. I understand that my participation in all employee benefit plans will cease on the effective date of my employment termination, except in accordance with the terms of the benefit plan or applicable law.

5. **Severability**. If any provision of this Agreement is deemed invalid, illegal or unenforceable in any respect, the enforceability of the remaining provisions contained in this Agreement will not, in any way, be affected or impaired. However, if the general release language is ruled to be unenforceable for any reason, I understand and agree to return the consideration paid to me by the Company, less my reasonable attorneys' fees.

6. **Miscellaneous**.

a. This Agreement is governed by North Carolina law.

b. This Agreement and any other documents referenced in it are the entire agreement between the Company and me regarding my employment termination.

c. I agree that this Agreement may only be changed by a written amendment signed by both the Company and me. Any changes to this Agreement after it was first presented to me, whether material or immaterial, do not restart the decision period described in the Section entitled "Period to Consider Signing the Agreement."

d. The executed version of this Agreement may be delivered by email to: myhr@pactivevergreen.com, and upon receipt, such transmission shall be deemed delivery of an original. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which together will constitute one document. The executed version of this Agreement may be also mailed USPS to Pactiv Evergreen, attention myHR Services, 1900 W. Field Court, Lake Forest, IL 60045. The executed version of this Agreement may also be provided directly to a member of the HR Team at the Old Post Office during the week of June 12th-June 16th between 9 a.m. – 11:30 a.m and 1:00 p.m. – 4:00 p.m. each day during this week.

7. **Period to Consider Signing Agreement**. I have been given a period of forty-five (45) days to consider whether I want to sign this Release.

8. **Consulting an Attorney**. I acknowledge that I have been advised to consult with an attorney and that any legal consultation will be at my own expense. I have had an adequate opportunity to consult with an attorney, and I have read and understand the terms of this Release and am voluntarily signing this Release.

9. **Revocation Period**. This Release does not become effective for a period of seven (7) days after it is signed by me and I have the right to revoke it during that period. Any revocation must be in writing and sent to JD Bowlin (Chief Human Resources Officer) at his mailing address of 1900 W. Field Court Lake Forest, IL 60045 or to his email address of jd.bowlin@pactivevergreen.com, within the seven (7) day period. I understand that I may not waive the seven (7) day revocation period. If a written revocation is not sent by the end of the seven (7) day period, this Release will become fully enforceable at that time. I understand that if I revoke this Agreement, I will not be entitled to receive separation pay and all of Employer's obligations under this Agreement will immediately cease.

10. **Required Disclosures.** In accordance with federal law, attached as Exhibit A is a list of the job titles and ages of those employees whose positions are being eliminated and are eligible for the severance program, as well as a list of the job titles and ages of those employees who were not separated and are therefore not eligible for the program.

IN WITNESS WHEREOF, the Parties have executed this Release on the date or dates set forth below.

PLEASE READ CAREFULLY. THIS SEPARATION AGREEMENT AND RELEASE INCLUDES THE RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

EMPLOYEE:

*JEFFERY EUGENE CABE*
Date: 6/12/23

Note: This Agreement may not be executed before June 9, 2023

PACTIV LLC

*[signature]*

By: JD Bowlin
Its: Chief Human Resources Officer
Date: JUN 1 6 2023